FILED

2022 Jan-25  PM 03:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | |
|---|---|
| **MARVIN WALTON,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | Civil Action Number |
| **v.** ) | **7:20-CV-01841-AKK** |
| ) | |
| **KILOLO KIJAKAZI, Acting** ) | |
| **Commissioner of the Social Security** ) | |
| **Administration,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## MEMORANDUM OPINION

Marvin Walton seeks review of the final adverse decision of the Acting Commissioner of the Social Security Administration under 42 U.S.C. § 405(g) of the Social Security Act.  Doc. 1.  Walton contends that the Administrative Law Judge's decision, which became the final decision of the Acting Commissioner, was not supported by substantial evidence primarily because the ALJ failed to properly evaluate Walton's mental limitations and inappropriately considered a medical opinion not in the record.  *See* doc. 12 at 9–12.  As explained more fully below, the court finds that the ALJ's decision is due to be reversed and the matter remanded as instructed herein because the ALJ's findings that Walton suffered only a "moderate" limitation in concentration, persistence, and pace; could therefore stay on task for at least two-hour increments; and could thus perform other jobs in the national economy are not supported by substantial evidence.

## I.

Walton previously worked as a catfish-processing supervisor and a correctional officer.  R. 35.  In 2019, Walton filed for disability insurance benefits, alleging a disability onset of March 31, 2018, based primarily on knee and shoulder pain, post-traumatic stress disorder, major depressive disorder, anxiety, and sleep-related impairments.  *See* R. 22–23; doc. 12 at 4, 7–8.  After Walton's claims were denied, an ALJ held a hearing with Walton, his attorney, and a vocational expert and found that Walton was not disabled.  R. 17–20.  The SSA Appeals Council denied review, rendering the ALJ's decision the final decision of the Acting Commissioner.  R. 1.  Walton thereafter filed for review of the ALJ's decision, primarily contending it is not supported by substantial evidence.  Doc. 1.

## II.

On review, the court ascertains only whether (1) the record contains substantial evidence to sustain the ALJ's decision and (2) the ALJ applied the correct legal standards.  *See* 42 U.S.C. § 405(g); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  The Commissioner's factual findings are conclusive if they are supported by "substantial evidence."  *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  Substantial evidence refers to "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Id.*; *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  The threshold for this evidentiary sufficiency

"is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Rather, substantial evidence falls somewhere between a "scintilla" and a "preponderance of evidence." *Martin*, 894 F.2d at 1529; *Moore*, 405 F.3d at 1211. If substantial evidence supports the Commissioner's factual findings, then the court must affirm, even if the evidence preponderates against those findings. *Noble v. Comm'r of Soc. Sec.*, 963 F.3d 1317, 1323 (11th Cir. 2020).

When determining whether substantial evidence supports the Commissioner's decision, the court cannot decide the facts anew, reweigh the evidence, or substitute its judgment for the Commissioner's. *Id.* at 1323; *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). Despite this limited scope of review, however, the court must not automatically affirm the decision of the Commissioner. *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Bloodsworth*, 703 F.2d at 1239. The court "retain[s] an important duty to 'scrutinize the record as a whole' and determine whether the agency's decision was reasonable." *Simon v. Comm'r of Soc. Sec.*, 7 F.4th 1094, 1104 (11th Cir. 2021) (quoting *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986)). Courts review de novo the legal conclusions upon which the Commissioner's decision is based. *Id.* at 1103; *Moore*, 405 F.3d at 1211.

## III.

The Social Security Act "places a very heavy initial burden on the claimant to establish existence of a disability by proving that he is unable to perform his previous

work." *Bloodsworth*, 703 F.2d at 1240.  Indeed, "[t]his stringent burden has been characterized as bordering on the unrealistic." *Id.* (collecting cases).  To qualify for benefits, a claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."   42 U.S.C. §§ 423(d)(1)(A); 416(i)(1).  The ALJ walks through the following five assessments:

(1) whether the claimant is currently unemployed;
(2) whether the claimant has a severe impairment;
(3) whether the impairment meets or equals one listed by the Commissioner;
(4) whether the claimant is unable to perform his or her past work; and
(5) whether the claimant is unable to perform any work in the national economy.

20 C.F.R. § 404.1520(a); *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

"An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of 'not disabled.'" *McDaniel*, 800 F.2d at 1030 (citing 20 C.F.R. § 416.920(a)-(f)).[1]  If the claimant

---

[1] If a claimant's impairments do not meet or equal a listed impairment, as determined at Step Three, the ALJ determines the claimant's "residual functional capacity" on the basis of "all of the relevant medical and other evidence" in the case record.  20 C.F.R. § 404.1520(e).  *See also* 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations.").  The ALJ uses the residual functional capacity at Step Four to determine if the claimant can perform past relevant work and at Step Five to determine if the claimant can adjust to other work.  20 C.F.R. § 404.1520(e).

cannot perform past work, the ALJ must show other work the claimant can do. *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). The ALJ may use a vocational expert's testimony as "substantial evidence" of other jobs the claimant can perform if the ALJ "pose[s] a hypothetical question [to the vocational expert] which comprises *all* of the claimant's impairments." *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002) (emphasis added); *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1181 (11th Cir. 2011).

To determine whether a medical opinion or prior administrative medical finding is "persuasive," the ALJ must focus on supportability,[2] consistency,[3] the medical source's relationship with the claimant,[4] and the medical source's specialization.[5] 20 C.F.R. § 404.1520c. The most important of these factors are

---

[2] "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1).

[3] "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2).

[4] This includes the length of the treatment relationship, the frequency of the examinations, the purpose of the treatment relationship, the extent of the treatment relationship (*e.g.*, the kinds of testing performed), and the examining relationship (*i.e.*, whether the medical source actually examined the claimant or only reviewed the claimant's file). *Id.* § 404.1520c(c)(3).

[5] "Specialization" refers to whether the medical source has received "advanced education and training to become a specialist," which may render that source's findings more persuasive. *Id.* § 404.1520c(c)(4). In addition, the ALJ may consider evidence showing that a medical source "has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability program's policies and evidentiary requirements." *Id.* § 404.1520c(c)(5).

supportability and consistency, and the ALJ must articulate how persuasive he or she finds the medical opinions and prior administrative medical findings in a claimant's record. *Id.* § 404.1520(a)-(b).

When evaluating a claimant's mental limitations, the ALJ considers four categories of abilities to "evaluate how [the claimant's] mental disorder limits [her or his] functioning." 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00A(2)(b). These categories consist of how a claimant (1) "[u]nderstand[s], remember[s], or appl[ies] information"[6]; (2) "interact[s] with others"[7]; (3) "concentrate[s], persist[s], or maintain[s] pace"[8]; and (4) "adapt[s] or manage[s] [himself or herself]."[9] *Id.* To

---

[6] This term refers to "the abilities to learn, recall, and use information to perform work activities. Examples include: Understanding and learning terms, instructions, procedures; following one- or two-step oral instructions to carry out a task; describing work activity to someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; and using reason and judgment to make work-related decisions." 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00E(1).

[7] This term refers to "the abilities to relate to and work with supervisors, co-workers, and the public. Examples include: cooperating with others; asking for help when needed; handling conflicts with others; stating own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness." *Id.* § 12.00E(2).

[8] This term refers to "the abilities to focus attention on work activities and stay on task at a sustained rate. Examples include: Initiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day." *Id.* § 12.00E(3).

[9] This term refers to "the abilities to regulate emotions, control behavior, and maintain well-being in a work setting. Examples include: Responding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work

meet or medically equal a listed impairment, the claimant must establish an "extreme" limitation of one or "marked" limitation of two areas. *See id.* A "moderate" limitation means "functioning in this area independently, appropriately, effectively, and on a sustained basis is fair," *id.* § 12.00F(2)(c), while a "marked" limitation means "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited," *id.* § 12.00F(2)(d). An "extreme" limitation means "[the claimant is] not able to function in this area independently, appropriately, effectively, and on a sustained basis." *Id.* § 12.00F(2)(e); *Pinckney v. Comm'r of Soc. Sec.*, 853 F. App'x 347, 351 (11th Cir. 2021).

## IV.

In this case, at Step One, the ALJ determined Walton had not engaged in substantial gainful activity since his onset date. R. 22. At Step Two, the ALJ found that Walton suffered from severe impairments: morbid obesity, osteoarthritis, plantar fasciitis, tendinitis, diabetes mellitus, gout, arthritis, trigger finger, right shoulder degenerative disc disease, PTSD, major depressive disorder, and general anxiety disorder. *Id.* The ALJ also deemed Walton's hypertension and obstructive sleep apnea "medically determinable impairments" but stated these impairments

---

performance; setting realistic goals; making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions." *Id.* § 12.00E(4).

"would not have more than minimal effect on [Walton's] ability to perform basic work activities." R. 23.

At Step Three, the ALJ determined Walton's impairments did not meet or medically equal a listed impairment. *Id.* Looking at Walton's mental impairments, the ALJ found that Walton had a moderate limitation in "understanding, remembering, or applying information" and noted that Walton's function report and medical visits indicated "he had difficulty with memory and understanding" but no "significant deficit in memory." R. 23–24. *See also* R. 382–83 (describing Walton's difficulties with his short-term memory); *id.* at 387 (discussing the impact of Walton's depression on his cognition, including concentration and memory). The ALJ remarked that Walton's formal testing results in this area "were deemed unreliable." R. 24. *See also* R. 382–87 (noting Walton's "inconsistent" efforts and unreliable results on cognitive exams).

The ALJ next found that Walton had a moderate limitation in "interacting with others." R. 24. The ALJ noted that Walton had "difficulty getting along with others," "had been fired from a job" as a result, and "had a dysphoric and anxious mood" at some of his medical visits. *Id.* However, the ALJ found that Walton's records "show[ed] that he was usually calm, cooperative and made good eye contact with his treating providers." *Id.*

8

The ALJ also found that Walton had a moderate limitation in "concentrating, persisting or maintaining pace." *Id.* Citing Walton's functional report and several office visits, the ALJ noted that Walton "reported difficulty with focus and concentration" but that Walton "was usually noted to be alert and oriented at each of his mental health clinic follow-ups." *Id. See also* R. 73–75; R. 204–09 (documenting Walton's difficulty staying on task for increments over 15 minutes long). In addition, the ALJ stated that "[Walton] was usually not noted to be distractible." R. 24. *But see, e.g.*, R. 387 (discussing the effects of Walton's depression on his concentration).

Finally, the ALJ found that Walton had a moderate limitation in "adapting or managing [himself]." *Id.* Although Walton "reported difficulty with handling stress and adapting to change," the ALJ remarked that "[Walton] was consistently noted to be appropriately dressed with good grooming and hygiene." *Id.* The ALJ also noted "more recent records show[ing] that [Walton] had limited insight and judgment, which show[ed] that he ha[d] difficulty managing his psychologically based symptoms." R. 24–25.

Taken together, because the ALJ found that Walton did not have one "extreme" limitation or two "marked" limitations, the ALJ concluded that Walton's impairments did not equal a listed impairment. *See* R. 25. Thus, at Step Four, the ALJ considered Walton's symptoms, gleaned from his medical records and

9

testimony, to determine his residual functional capacity. *See id.* The ALJ began with Walton's hearing testimony, in which Walton stated that "he was no longer able to work because of a lot of arthritis pain in [his] knees and shoulder" and because "he had PTSD and anxiety." R. 26; R. 52. Walton also testified as to the treatments for his knees, which caused him pain, and that his shoulder prevented him from lifting overhead. *Id.*; R. 58. Walton explained that his diabetes "cause[d] him to feel sick and dizzy," he had headaches, his medications "ma[d]e him sleepy," and his PTSD "cause[d] him to have nightmares three times per month" and made it difficult to sleep. R. 26; R. 59–60. He also explained that his PTSD and anxiety symptoms, including "nervousness, sweating, and stomach pain," occurred "three times per week for approximately one hour each time" and that his medications did not help despite adjustments by his doctor. R. 26; R. 61–62. Turning to Walton's self-report, the ALJ noted that Walton spent most of his time watching television and playing video games; did not cook, clean, or perform yardwork; could fold clothes with breaks every 15 minutes; could not drive far; and had difficulty concentrating for over 15 minutes at a time. *See* R. 27; R. 204–09.

The ALJ compared this testimony with the record and concluded that "the evidence of record [did] not fully supported [sic] [Walton's] alleged loss of functioning." *Id.* Reviewing Walton's physical limitations, the ALJ noted that Walton's knees limited him to a "light exertional level" but that he "ha[d] received

10

a course of conservative treatment without recommendation for more progressive treatment." R. 27. The ALJ cited Walton's visits to Veterans Affairs and physical therapy, where he had decreased or painful motion in his shoulder and knees but "was able to spend 45 minutes doing a variety of exercises." *Id.* The ALJ proceeded to review VA visits from March 2018 through December 2018, during which Walton presented with foot, hand, and shoulder pain; received diagnoses related to tendinitis and diabetes; and received several treatments of injections or acetaminophen. *See* R. 28. Several X-rays and examinations came back "normal." *See id.*

The ALJ then cited a 2019 state-agency review that revealed that Walton continued to experience pain in his knee and hand but "had normal range of motion in all tested joints except for his left shoulder, left hand, and left hip" and "normal strength in all extremities except for slightly decreased strength in his left lower extremity." R. 28–29. This evaluation also "indicated that [Walton] had difficulty getting on and off the exam table, walking on his heels, walking on his toes, and squatting." R. 29.

Turning to more recent medical records, the ALJ noted that from late 2019 through 2020, Walton began to exercise and ambulate independently. *See id.*; R. 1165 (documenting Walton's exercise regimen). He also received anti-inflammatory medication to treat muscle strain and pain and was referred to physical therapy. *Id.*; R. 1178. Around this time, X-rays indicated that Walton had "mild to

moderate degenerative changes" in his right knee and left shoulder.  R. 29; R. 1295.

Although at the hearing Walton testified that physical therapy had not helped, *see* R.

53, he apparently told the physical therapist that he had improved, *id.  See also* R.

1295 ("Has had PT in the past, helped at the time."). Taken together, the ALJ

concluded that Walton "ha[d] consistently received treatment for his

musculoskeletal impairments"; that "[d]espite his persistent complaints of knee and

shoulder pain, [Walton] ha[d] only received conservative treatment since his alleged

onset date"; and that though Walton's knee did not improve much throughout

treatment, his shoulder did.  *Id.*  The ALJ added that Walton "retain[ed] the ability

to perform work at a reduced range of the light exertional level," in part because

Walton could "walk two miles and lift lightweights while exercising."  *Id.*

The ALJ "included additional non-exertional limitations" in Walton's residual

functional capacity "to account for [his] obesity, intermittent gout flare-ups, trigger

finger, tendinitis, and limited range of motion in the knees and shoulders."  *Id.*

Specifically, the ALJ limited Walton to "never kneeling, crawling, or climbing

ladders[,] ropes, and scaffolds" and "occasionally balancing, stooping, crouching,

and climbing."  *Id.*  The ALJ also limited Walton "to only occasional overhead

reaching and reaching in all other directions" but declined to provide for "[g]reater

limitations" given Walton's positive responses to physical therapy.  *Id.*

As for Walton's mental health, the ALJ noted that the evidence showed "significant medical history involving treatment for both depression and anxiety." R. 30.  The ALJ summarized Walton's worsening memory problems but noted that on a "not reliable" cognitive test, Walton "still scored in the average range of several measures, including verbal memory."  *Id.*; R. 385.  In addition, Walton complained of nightmares, poor sleep, and difficulty focusing in mental-health visits from 2018 to 2019, but his doctor "usually recorded normal mental status examination findings" with "good hygiene"; "good eye contact"; "cooperative and calm" demeanor; alertness and orientation; and "normal" thought process, insight, and judgment.  *Id.* In the ALJ's retelling, records from 2019 apparently indicated improvement except for Walton's sleep habits, and several doctors adjusted his treatment regimen throughout 2019 and 2020.  *See* R. 30–31.

Taken as a whole, the ALJ summarized the evidence as demonstrating that Walton's impairments "generally remained stable" and that he obtained "some relief with treatment."  R. 32.  The ALJ limited Walton to two-hour periods of concentrating and carrying out instructions at a time and "frequent and casual interaction" with others.  *Id.*  Relevant to Walton's appeal, in reaching these determinations, the ALJ found persuasive the statement of Dr. Yon, the VA neuropsychologist who recounted that Walton's cognitive testing "was not reliable due to inconsistent effort" but that Walton "appeared capable of performing tasks

13

which require only simple attention." R. 34; R. 382–83. The ALJ determined that Dr. Yon's statement "[was] supported by and consistent with the evidence of record as a whole, which show[ed] that [Walton] consistent [sic] had intact memory and was alert at almost all of his . . . visits." R. 34–35.

Finally, using Walton's residual functional capacity, the ALJ determined at Steps Four and Five that Walton could not perform his past work. R. 35. Based on Walton's age, education, work experience, and residual functional capacity, paired with the vocational expert's testimony, the ALJ concluded that Walton could perform the roles of small parts assembler, bench assembler, or mail clerk and found that Walton was not disabled. R. 35–37.

## V.

Walton argues that the ALJ's decision was not supported by substantial evidence because the ALJ did not properly evaluate Walton's mental health, the evidence of which indicated "marked" rather than "moderate" limitations. *See* doc. 12 at 9–12. In addition, Walton asserts that the ALJ inappropriately considered a medical opinion not in the record, namely, the finding attributed to Dr. Yon that Walton could perform tasks requiring simple attention. *See id.* at 12.

## A.

As his first contention of error, Walton claims that the ALJ should have found that Walton experienced marked limitations in each of the four areas of cognitive

function.  *See id.* at 9–12.  Allegedly, the ALJ "failed to provide any evidence to support a moderate limitation" in any of the areas.  *See id.*  However, the ALJ's written decision indicates that the ALJ considered and cited Walton's function report and the records of his medical visits.  *See* R. 23–25.  Walton's contention therefore oversimplifies the ALJ's decision.

But there is merit to Walton's secondary claim that the evidence in the record affirmatively illustrates that he experienced marked limitations in these four areas.  *See, e.g.*, doc. 12 at 9.  On independent review, the court agrees with Walton that the ALJ misconstrued or failed to account for the evidence as it pertains to Walton's concentration, persistence, or pace.  *See* doc. 12 at 8–11.  Put simply, the evidence in this area supports a limitation greater than "moderate."  Because this conclusion implicates whether the ALJ accurately characterized Walton's residual functional capacity, upon which the vocational expert's testimony was based, the court first addresses the evidence supporting Walton's limitations before turning to Walton's residual functional capacity.

1.

As to the functional area of concentrating, persisting, or maintaining pace, the ALJ noted that Walton reported difficulty concentrating but that "[Walton] was usually noted to be alert and oriented at each of his mental health clinic follow-ups. . . . [and] was usually not noted to be distractible."  R. 24.  This conclusion is

belied in part by the lengthy report of Dr. Yon, whom the ALJ found persuasive and who discussed in detail Walton's "cognitive problems" with concentration as they related to his diagnoses of depression and PTSD. *See, e.g.*, R. 387. While the ALJ cited Walton's function report and Dr. Yon's report elsewhere in the written decision, the ALJ erred by failing to address these and other evidence demonstrating that Walton could not concentrate for extended periods and perhaps for less than 15 minutes at a time. *See, e.g.*, R. 24; R. 73–75; R. 206–08; R. 382–87. Although the ALJ discussed some of Walton's concentration-related problems, the ALJ seemed to discount them by relying on evidence that Walton appeared "well-groomed," "alert," and "oriented" during medical visits. *See* R. 24; R. 33. This evidence, though perhaps relevant to other areas of functioning, does not seem to bear on Walton's concentration. Given the court's duty to assess the reasonableness of the ALJ's decision as a whole, *see Noble*, 963 F.3d at 1323; *Simon*, 7 F.4th at 1104, the court finds that the evidence of Walton's concentration does not reasonably show his abilities to "independently, appropriately, effectively, and on a sustained basis" "focus attention on work activities and stay on task at a sustained rate" are "fair." *See* 20 C.F.R. Pt. 404, Subpt. P., App. 1, §§ 12.00A(2)(b), 12.00E(2).

However, the ALJ accurately described and addressed the evidence as to the other three functional areas: understanding, remembering, and applying information; interacting with others; and adapting or managing oneself. In addition, as to these

areas, Walton does not point sufficiently to specific errors that indicate the ALJ incorrectly evaluated this evidence when determining his impairments.[10] Substantial evidence thus supports the ALJ's findings as to these three functional areas.

2.

After concluding Walton had a "moderate" limitation in concentration, the ALJ described Walton's residual functional capacity:

> [Walton] has the residual functional capacity to perform light work . . . except [he] can never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs, balance, stoop, and crouch; never kneel or crawl; occasionally reach overhead with left upper extremity; frequently reach in all other directions with left upper extremity; never work with hazardous moving machinery; never work at unprotected heights; and frequently finger and handle with the left upper extremity. [He] can understand, remember, and carry out simple instructions; *can maintain attention and concentration for two-hour periods at a time*; can have frequent and casual interaction with the general public; can adapt to routine and infrequent workplace changes; and can make simple work related decision [sic].

R. 25 (emphasis added).  Using this description, the ALJ posed a hypothetical question to the vocational expert to ascertain whether Walton could perform his past work or other jobs existing in the national economy.  *See* R. 79–80.

---

[10] For instance, Walton asserts that the ALJ should have found a marked limitation in understanding, remembering, and applying information because "none of the records specifically cited by the ALJ contain any objective findings or considerations of memory" and because Walton's "extensive mental health treatment record . . . shows repeated and consistent difficulties with memory."  Doc. 12 at 9.  But the ALJ discussed these findings in her opinion, noting nonetheless that Walton "was consistently noted to have intact memory."  *See* R. 24; R. 32.  *See also* R. 1265–1270 (reporting that Walton had "no perceived deficit" in memory).  On this evidence, the court cannot conclude that the ALJ erroneously characterized or evaluated Walton's memory-related evidence.

17

However, as described above, the evidence suggests that the ALJ should have accounted for more restrictive limitations regarding Walton's ability to concentrate or focus on work-related tasks.  And "[b]ecause the ALJ asked the vocational expert a hypothetical question that failed to include or otherwise implicitly account for all of [Walton's] impairments," namely, his more severe limitation in concentrating, persisting, or maintaining pace, "the vocational expert's testimony [was] not 'substantial evidence' and cannot support the ALJ's conclusion that [Walton] could perform significant numbers of jobs in the national economy."  *See Winschel*, 631 F.3d at 1181 (reversing and instructing the ALJ to question the vocational expert using the claimant's limitation in concentration).  Indeed, when the ALJ asked the vocational expert about jobs that permitted employees to take up to three unscheduled 15-minute breaks during the workday, possibly accounting for Walton's difficulties staying on task, the vocational expert answered that this limitation would essentially preclude work.  *See* R. 81.

In sum, the ALJ incorrectly addressed Walton's limitation in concentration, persistence, and pace, which led the ALJ to determine a residual functional capacity and pose hypothetical questions to the vocational expert that did not accord with Walton's abilities.  As a result, the ALJ's finding that Walton could perform other jobs in the economy is not supported by substantial evidence.  *See Winschel*, 631 F.3d at 1181.  On remand, the ALJ should consider the extent of the evidence

supporting Walton's limitation in this area—whether marked or extreme—and include restrictions in hypotheticals to the vocational expert that would permit the accurate assessment of other jobs, if any, Walton can perform.

## B.

Walton also contends that the ALJ "erred in evaluating the opinion of the VA neuropsychologist, Dr. Yon," because Dr. Yon's statements indicating that Walton could perform tasks requiring only "simple attention" were opinions of a prior evaluator, not Dr. Yon herself. *See* doc. 12 at 12. Essentially, Walton argues that Dr. Yon was merely "reciting . . . the prior examination" when she opined that Walton could perform simple tasks, and using Dr. Yon's statement violated Walton's due process rights because she failed to actually assess Walton's capabilities. *See id.* at 12–13.

It is true Dr. Yon summarized Walton's medical history through 2017 before "document[ing] relevant changes since that time as well as current test results and their interpretation." *Id.* at 12; R. 383. However, the ALJ cited aspects of Dr. Yon's opinion that appear to go beyond restatements, *see* R. 31, and Dr. Yon based her report on both Walton's record and an interview with him, *see* R. 34; R. 382. Moreover, the ALJ noted that the report accorded with other evidence in the record and deemed important that Dr. Yon had the "opportunity to personally examine [Walton] in evaluating her opinion." R. 34–35. *See also* 20 C.F.R. § 404.1520c

(instructing ALJs to consider the "consistency" and "supportability" of medical opinions to determine their persuasiveness).

Additionally, reviewing the record and the ALJ's decision as a whole, even assuming the ALJ's citation to Dr. Yon's opinion was inappropriate, reversal on this ground is not warranted. "[T]here must be a showing of prejudice before it is found that [Walton's] right to due process [was] violated to such a degree that the case must be remanded to the [SSA] for further development of the record." *See Graham v. Apfel*, 129 F.3d 1420, 1423 (11th Cir. 1997). In this case, the ALJ considered an array of medical records and the opinions of several doctors and reviewing physicians to arrive at Walton's residual functional capacity. *See* R. 27–35. Although the ALJ's finding of only a moderate limitation in concentration, persistence, and pace is not supported by substantial evidence, *see supra* § V.A., it is not the ALJ's potential reliance on this particular statement in Dr. Yon's report that warrants remand.

## VI.

To summarize, the ALJ's finding of only a moderate limitation in Walton's ability to concentrate, persist, or maintain pace was not supported by substantial evidence. As a result, the ALJ's determination of Walton's residual functional capacity and hypothetical questions to the vocational expert did not fully account for

Walton's limitations, requiring reversal and remand. *See Winschel*, 631 F.3d at 1181.

On remand, the ALJ should consider all of the evidence in the record, especially Walton's self-report, his testimony, and the abundant medical records documenting his depression and PTSD and their effects on his concentration, to ascertain Walton's limitation in this functional area. If this leads to a finding of a marked limitation,[11] the ALJ should use this determination to formulate a residual functional capacity and pose accurate hypotheticals to the vocational expert. The court will effectuate this opinion by separate order.

**DONE** the 25th day of January, 2022.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE

---

[11] An "extreme" limitation leads directly to a finding of disability, bypassing Steps Four and Five. *See* 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00A(2)(b).

21